UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 10 CR 240 |
| vs. | ) | Judge James B. Zagel |
| | ) | |
| RAJA LAHRASIB KHAN | ) | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through PATRICK J. FITZGERALD, United States Attorney for the Northern District of Illinois, respectfully submits its Government's Sentencing Memorandum, and states as follows:

**INTRODUCTION**

The goal of sentencing is to achieve a sentence that is "sufficient but not greater than necessary." 18 U.S.C. § 3553(a). In determining a reasonable and fair sentence, the Court must account for a variety of factors specific to the particular defendant and particular case. The framework for determining an appropriate sentence is set forth in Section 3553(a). In particular, Section 3553(a) requires that the Court ensure the sentence imposed properly considers, among other factors: (1) the nature and circumstance of the offense; (2) the history and characteristics of the defendant; (3) the need to reflect the seriousness of the offense, to promote respect for the law, and provide just punishment for the offense; (4) the need to afford adequate deterrence; (5) the need to protect the public from further crimes of the defendant; (6) the properly calculated Sentencing Guideline range along with pertinent policy statements provided by the Sentencing Commission; and (7) the need to avoid unwarranted sentencing

disparities.

At sentencing, the government anticipates making a motion pursuant to U.S.S.G. § 5K1.1 for the Court to impose a sentence that is below the advisory guideline sentence – 180 months – based on defendant's cooperation. Accordingly, for the reasons below, a sentence of 8 years' imprisonment is reasonable, fair, and sufficient, but not greater than necessary, to comply with the sentencing purposes described in Section 3553(a).[1]

## SENTENCING FACTORS UNDER 18 U.S.C. § 3553(a)[2]

### I. The Nature and Circumstances of the Offense and Defendant's History and Characteristics (18 U.S.C. § 3553(a)(1))

The nature and circumstances of the offense, and defendant's history and characteristics support the reasonableness and appropriateness of a sentence of 8 years' imprisonment.

In March 2010, defendant attempted to provide $1,000 to the now-deceased terrorist leader Ilyas Kashmiri. Prior to this, defendant, who had met with Kashmiri on two occasions, provided Kashmiri with, in total, approximately $500 to $550, in two separate transactions – one in approximately 2008 and one in November 2009. At the

---

[1] Defendant's Plea Agreement is governed, in part, by Fed. R. Crim. P. 11(c)(1)(C), and the parties have agreed that: (1) the sentence imposed by the Court shall include a term of between 5 and 8 years' imprisonment; and (2) the parties are free to recommend whatever sentence within the agreed upon range that each deems appropriate.

[2] The information is this section is from either the Plea Agreement (Dkt. 55) or from the Government's Version of the Offense, which is attached to the Presentence Investigation Report.

2

time he engaged in this offense and relevant conduct, defendant knew *inter alia* that: (1) Kashmiri was working with and training *al Qaeda*; (2) Kashmiri was in direct contact with Osama Bin Laden; (3) Bin Laden was healthy, alive, and giving orders to Kashmiri, which Kashmiri passed on to others; and (4) *al Qaeda* and Bin Laden had engaged in horrific acts of terrorism against the United States and others. *See, e.g.,* GVO at 9-10 (defendant describing that Kashmiri and *al Qaeda* were the "same" and that Kashmiri "unites the attack"); GVO at 14-15 (defendant describing Kashmiri's training of *al Qaeda* and others); GVO at 15-18 (defendant describing his 2008 meeting with Kashmiri in Miranshah[3] during which Kashmiri described Bin Laden as healthy, alive, and "giving orders," which Kashmiri then passed to the *"mujahideen. . .al Qaeda* and Taliban"); GVO at 12-13 (defendant apparently referencing Bin Laden's acknowledgment of *al Qaeda*'s involvement in the 9/11 attacks, and defendant referencing *al Qaeda*'s attacks against two U.S. embassies in Africa and the U.S.S. Cole); GVO at 18 (defendant describing Kashmiri as "the main key. . .after Osama Bin Laden"); *compare* Dkt. 55 at 3-6 (defendant knew, was aware of, or had grounds to believe that Kashmiri was working with and providing training to *al Qaeda*, an organization that had engaged in terrorist activity around the world).[4]

---

[3] Miranshah is the capital of the North Waziristan region of Pakistan. Waziristan is located in Pakistan's Federally Administered Tribal Areas, in the northwestern portion of Pakistan, and borders Afghanistan. Miranshah is located on the opposite side of Pakistan from the Kashmir region.

[4] The Government's Version of the Offense contains a more fulsome description of and transcript excerpts from defendant's February and March 2010 recorded meetings with an undercover law enforcement agent (the "UC"), during which these

3

At the time he provided and attempted to provide funds to Kashmiri, defendant was also aware that: (1) Kashmiri had been involved in attempts to assassinate the President of Pakistan; (2) Kashmiri sent *al Qaeda,* Taliban, and, presumably, other individuals trained by him to fight not just in Pakistan or India, but in Georgia, Palestine, Iraq, and Afghanistan; and (3) Kashmiri was interested in training individuals to conduct attacks in the United States, including training on how to make explosives, and to "blow up the buildings or the bridge, for the peoples." *See* GVO at 7, 13-15,19-20.[5] Despite all of his knowledge regarding Kashmiri and Kashmiri's relationship with Bin Laden and affiliation to *al Qaeda*, as well as regarding *al Qaeda*'s commission of horrific terrorist attacks against the United States, defendant still provided and attempted to provide money to Kashmiri on three occasions.

The severity of defendant's conduct is compounded by several facts. First, defendant emigrated to the United States and, ultimately, obtained U.S. citizenship over 20 years ago. Subsequently, he raised a family in the United States (at times), was gainfully employed in the United States, and enjoyed the rights, privileges, and

---

matters were discussed.

[5] In January 2010, prior to defendant's first meeting with the UC, Kashmiri and others were indicted in the Northern District of Illinois for their roles in a conspiracy to murder and maim in connection with an attack to be carried out against the facilities of the Danish daily newspaper Morgenavisen Jyllands-Posten, located in Denmark, and at least two of its employees, as retribution for the Jyllands-Posten's publication of cartoons, some of which depicted the Prophet Mohammed. *See United States v. Ilyas Kashmiri et al.*, No. 09 CR 830 (N.D. Ill.). Kashmiri was a fugitive at the time of his death. Two other defendants either pleaded guilty or were convicted at trial of their involvement in this plot.

4

benefits of living in and being a citizen of the United States. Despite these benefits, defendant attempted to provide funds to *al Qaeda*, a group whose stated purpose includes the destruction of the United States (defendant's adopted country).

Second, while defendant claims that he was motivated to provide funds to Kashmiri for the primary purpose of supporting the fight for Kashmir independence, in addition to defendant's knowledge of Kashmiri's ties to *al Qaeda*, defendant's statements to the UC indicate that defendant also supported Bin Laden and approved of *al Qaeda*'s past attacks against the United States. Among other things, defendant, apparently referencing Bin Laden's acknowledgment of *al Qaeda*'s involvement in the 9/11 attacks, stated, "I love that Osama Bin Laden, he says the last fifty years we have been, you know, tasting. . .now America will taste that." GVO at 12. Defendant then referred with approval to *al Qaeda*'s attacks against the U.S. embassies in Kenya and in Tanzania, and against the U.S.S. Cole in Yemen. These attacks resulted in hundreds of deaths and thousands of injured. GVO at 12-13.

Third, during meetings with defendant, the UC portrayed himself as someone: (1) with access to unlawful drug proceeds; (2) who held strong anti-U.S. beliefs and wished to harm the United States; (3) was interested in sending money to Ilyas Kashmiri to purchase weapons and ammunition, *only if Kashmiri was working with al Qaeda*; and (4) was interested in sending individuals into Pakistan to receive military-style and other training so that they could conduct attacks against U.S. forces and interests. *See* GVO at 6-7; *see also* Dkt. 55 at 4-5. Despite knowing the UC's purported motives and intentions, defendant repeatedly met with the UC, agreed to

5

transport the UC's funds to Pakistan and deliver them to Kashmiri, and offered to assist the UC with arranging for the above-referenced training if the UC or an associate could arrange for the trainees to travel to Pakistan. *See, e.g.,* Dkt. 55 at 5-6.

Fourth, defendant took affirmative steps to avoid law enforcement detection and his course of conduct plainly revealed a consciousness of his own guilt. Among other things, he used the code word "Lala" to refer to Kashmiri with Individual A and with the UC. As defendant explained, "Lala" meant "older brother" in Urdu. As such, if anyone asked to whom defendant or the UC were referring when they said "Lala," they could claim that it was merely a reference to defendant's older brother. In addition, rather than carry the funds himself directly from the U.S. to Pakistan, defendant attempted to avoid government scrutiny by having his son transport the UC's funds to the U.K., where defendant was going to retrieve the funds and deliver them to Kashmiri in Pakistan. Defendant did so because he believed that, since his son's destination was the U.K. and not Pakistan (unlike defendant's), government officials would be less inclined to inspect defendant's son at the airport. *See* GVO at 11-12. Furthermore, on more than one occasion, defendant advised the UC to not let anyone know about what they were scheming. *See* GVO at 12; GVO at 15 (defendant stating, "If anything happens. . .never comes, you name, from my, this tongue. I don't know you, you don't know me."). Finally, defendant attempted to destroy evidence when he learned of his son's search and detention in the U.K. As described in the Government's Version of the Offense, during a March 2010 search warrant execution at defendant's residence, agents recovered torn up Western Union receipts and paperwork in a

garbage can, which documents related to defendant's November 2009 transfer of funds to Individual A in Pakistan for Kashmiri. GVO at 20.

## II. The Need to Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment for the Offense (18 U.S.C. § 3553(a)(2)(A))

The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense all support a sentence of 8 years' imprisonment.

To engage in violent terrorist activity against civilians and governments around the world, unlawful organizations like *al Qaeda* are dependent on the flow of funds from donors. Although defendant's actual donations (approximately $500 to $550) and attempted donation ($1,000) were, relatively speaking, not incredibly substantial amounts, donations need not be large to be of assistance to terrorist organizations.

The need for terrorist groups to receive donations of any size was confirmed by defendant's repeated descriptions to the UC regarding Kashmiri's need for money in any amount, even "one dollar or fifty cents." GVO at 10 (defendant describing Kashmiri's reliance on donations); *see, e.g.,* GVO at 8 (defendant describing Kashmiri as saying "in the black market, you get everything, but we need money. . ."); GVO at 13 (defendant describing Kashmiri as saying "if we have money we can buy anything on the black market. . .Just, we need money, that's it."); GVO at 14 (defendant describing Kashmiri as saying "we can buy anything in the black market, but we need money. He says even one dollar, it counts. . .."). With such money, as defendant knew, Kashmiri could and was likely to purchase, among other things, weapons, firearms,

7

and explosives. Dkt. 55 at 5. As such, even a couple of hundred dollars, or a thousand, independently or pooled with others' donations, can be used by terrorist groups such as *al Qaeda* to acquire weapons, train terrorists, and support and facilitate deadly attacks.

The potential argument that defendant provided funds hoping to support Kashmiri's military-style attacks against India in the name of Kashmir independence would not justify defendant's criminal conduct. Defendant, a United States citizen, had no right to provide money to fund a private, non-governmental (or, any) war against India, a country with which the United States was at peace. *Cf.* 18 U.S.C. §§ 956 and 960. More importantly, a donor's purported motivation in donating funds to a terrorist organization is meaningless in assessing the harm that may result. As the Ninth Circuit Court of Appeals described in *Humanitarian Law Project v. Reno*, 205 F.3d 1130, 1136 (9th Cir. 2005):

> [A]ll material support given to [foreign terrorist] organizations aids their unlawful goals. Indeed, . . . terrorist organizations do not maintain open books. Therefore, when someone makes a donation to them, there is no way to tell how the donation is used. Further, . . . even contributions earmarked for peaceful purposes can be used to give aid to the families of those killed while carrying out terrorist acts, thus making the decision to engage in terrorism more attractive. More fundamentally, money is fungible; giving support intended to aid an organization's peaceful activities frees up resources that can be used for terrorist acts.

In fact, because money is fungible, Congress has determined that any monetary contribution to a foreign terrorist organization, like *al Qaeda*, facilitates terrorist conduct. *See Boin v. Quranic Literacy Inst. and Holy Land Foundation for Relief*, 291 F.3d 1000, 1027 (7th Cir. 2002).

8

Accordingly, even if defendant desired for his donations to be used solely for military-style attacks against India, defendant had no right to engage in the offense, his purported personal motivations are meaningless with regard to the potential harm resulting from his conduct, and his provision of funds to *al Qaeda* via Kashmiri could and may have facilitated deaths and serious injuries to others.

A sentence of 8 years' imprisonment reflects the seriousness of defendant's offense, would promote respect for the law by demonstrating that there are no *de minimis* or "good intention" exceptions to the Section 2339B(a)(1), and provides just punishment that is commensurate with defendant's offense and relevant conduct.

### III. The Need to Afford Adequate Deterrence to Criminal Conduct and to Protect the Public from Future Crimes by Defendant (18 U.S.C. §§ 3553(a)(2)(B) & (C))

A sentence at the high end of the agreed upon range (5 to 8 years' imprisonment) is more likely to serve the dual purposes of general and specific deterrence. First, an 8 year sentence (as opposed to a lower one) is more likely to demonstrate to others that there are meaningful consequences associated with providing *any* amount of funds to a designated foreign terrorist organization. Second, between the agreed range of 5 to 8 years' imprisonment, a sentence at the high end of that range will have a greater deterrent effect and is more likely to discourage defendant from using his claimed passion for Kashmir independence to facilitate his knowing violation of the law. *See* GVO at 11 (defendant to the UC, "[h]onest to God, if I don't get married in Pakistan I would be with Ilyas Kashmiri the rest of my life").

9

**IV.    The Properly Calculated Sentencing Guideline Range, Pertinent Policy Statements Provided by the Sentencing Commission, and the Need to Avoid Unwarranted Disparities (18 U.S.C. §§ 3553(a)(4)-(6))**

In this case, defendant's advisory guideline sentence is 180 months. However, the parties have agreed, pursuant to Fed. R. Crim. P. 11(c)(1)(C), that defendant's sentence shall include a term of between 5 and 8 years' imprisonment. Given the specific facts and circumstances of this case, including defendant's cooperation, a sentence of 8 years' imprisonment appropriately considers the Sentencing Guidelines and reflects the need to avoid unwarranted sentencing disparities, despite the significantly higher advisory guideline sentence.

## **CONCLUSION**

Taking into account defendant's cooperation, the government respectfully submits that a sentence of 8 years' imprisonment is reasonable, appropriate, and "sufficient but not greater than necessary" to comply with the sentencing purposes set forth in Section 3553(a).

        Respectfully submitted,

        PATRICK J. FITZGERALD
        United States Attorney

By:  s/ Christopher K. Veatch
        CHRISTOPHER K. VEATCH
        HEATHER K. MCSHAIN
        Assistant United States Attorneys
        219 South Dearborn St., 5th Floor
        Chicago, Illinois 60604
        (312) 886-3389

        JOSEPH N. KASTER
        Trial Attorney
        U.S. Department of Justice
        National Security Division

**CERTIFICATE OF SERVICE**

The undersigned Assistant United States Attorney hereby certifies that the following document:

**GOVERNMENT'S SENTENCING MEMORANDUM**,

was served on June 1, 2012, in accordance with Fed. R. Crim. P. 49, Fed. R. Civ. 5, LR 5.5, and the General Order on Electronic Case Filing (ECF) pursuant to the district court's system as to ECF filers.

                                                s/ Christopher K. Veatch
                                                CHRISTOPHER K. VEATCH
                                                Assistant United States Attorney
                                                219 S. Dearborn Street, 5th Floor
                                                Chicago, Illinois 60604
                                                (312) 886-3389