**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 10 Cr 240 |
| | ) | Judge James B. Zagel |
| RAJA LAHRASIB KHAN, | ) | |
| Defendant. | ) | |

**DEFENDANT'S OBJECTIONS TO THE PRESENTENCE INVESTIGATION
REPORT, POSITION PAPER, COMMENTARY ON SENTENCING FACTORS,
AND RESPONSE TO THE GOVERNMENT'S SENTENCING MEMORANDUM**

Defendant, **RAJA LAHRASIB KHAN,** by and through his attorneys, **THOMAS
ANTHONY DURKIN**, **JANIS D. ROBERTS** and **JOSHUA G. HERMAN**, pursuant to Rule
32(c) of the Federal Rules of Criminal Procedure, the opinions of the United States Supreme
Court in *United States v. Booker,* 543 U.S. 220 (2005), *Rita v. United States,* 551 U.S. 338
(2007), *Gall v. United States,* 552 U.S. 38 (2007), *Kimbrough v. United States,* 552 U.S. 85
(2007), and *Nelson v. United States,* 555 U.S. 350 (2009), as well as 18 U.S.C. §3553(a),
respectfully submits the following: (1) Defendant's Objections to the Presentence Investigation
Report; (2) Position Paper and Commentary on Sentencing Factors; and (3) Response to the
Government's Sentencing Memorandum.

I.     <u>BACKGROUND</u>

       Mr. Khan was arrested on March 26, 2010, pursuant to an arrest warrant and a criminal
complaint that was filed on March 25, 2010, and that charged Mr. Khan with attempting to
provide material support to a designated foreign terrorist organization in violation of 18 USC
§2339(B)(a)(1). Mr. Khan has been held in custody since the day of his arrest. (Presentence
Investigation Report ("PSI"), p. 19, line 477.) Moreover, from March 26, 2010, to July 28, 2011,

or for 489 days, Mr. Khan was held in segregation in the Special Housing Unit (the "SHU") at the Metropolitan Correctional Center (the "MCC".)  (PSI, p. 19, line 477.)  As noted in the PSI, and as discussed more fully below, Mr. Khan, who is now fifty-eight years old, developed numerous physical and mental health problems during his incarceration in the SHU.  (PSI, pp. 12-14; p. 19, lines 477-81.)  Mr. Khan's extended incarceration in the SHU was not for any disciplinary reasons, but rather for administrative purposes.[1]

On February 6, 2012, Mr. Khan pled guilty to one count of providing material support to a designated foreign terrorist organization, in violation of 18 USC §2339B(a)(1).[2]  In the Plea Agreement, the government acknowledged Mr. Khan's cooperation and substantial assistance; and further indicated its express intention to move the Court for a downward departure from the low-end of the applicable Guideline range pursuant to Guideline §5K1.1.  (Dkt. No. 55, ¶ 12.)  Upon the government's §5K1.1 motion, the Plea Agreement is to be governed by FED. R. CRIM. P. 11(c)(1)(C).  And pursuant to Rule 11(c)(1)(C), the parties have agreed that a term of imprisonment between five and eight years reflects an appropriate disposition of this case.  (*Id*., ¶ 13; PSI, p. 18, lines 458-64.)   The Court also indicated at the time of entry of the guilty plea that it was accepting the agreement.

## II.      OBJECTIONS TO THE PRESENTENCE INVESTIGATION REPORT.

### A.      PART A.  THE OFFENSE
####          The Offense Conduct
####          Page 5, lines 35-38

The PSI asserts that the Criminal Complaint filed in this case stated that "in April 2006, the United States Department of State listed a number of designated terrorist organizations which

---

[1] Those administrative purposes are surely the nature of the charges in this case. Counsel are aware from another similar case pending in this District that the Warden of the MCC unilaterally confines anyone charge with a material support case to the SHU.

[2] Defendant pled guilty to Count Two of the Indictment.  The government has agreed to dismiss Count One of the Indictment after sentence has been imposed on Count Two.  (Dkt. No. 55, ¶ 18.)

included Harakay ul-Jihad-I-Islami (HUJI), a Sunni extremist group with links to al Qaeda."

(PSI, p. 5, lines 35-36.)  However, the Criminal Complaint actually states that the April 2006

Department of State report listed HUJI in a category entitled "Other Groups of Concern," not as

a designated terrorist organization.  (Dkt. No. 1, ¶ 11.)  While HUJI is currently a designated

terrorist organization, such designation did not occur until on or about August 6, 2010, well after

the offense conduct in this case.[3]

       **B.**      **PART C. OFFENDER CHARACTERISTICS**
                     **Personal and Family Data**
                     **Page 11, lines 241-246, *et seq*.**

The PSI describes D.S. as Mr. Khan's "girlfriend" throughout the report.  To clarify,

D.S., who has been a constant and supportive presence for Mr. Khan during his incarceration, is

Mr. Khan's wife through an Islamic ceremony that took place in early 1998.  (*See* D.S. letter, p.

1.)[4]

       **C.**      **PART C. OFFENDER CHARACTERISTICS**
                     **Financial Condition: Ability to Pay**
                     **Page 16, lines 400-402**

In discussing Mr. Khan's financial condition, the PSI reports that, based on information

obtained from a "Westlaw asset database," Mr. Khan purchased a condominium located in

Chicago in 2007 for $230,000 after obtaining a mortgage for $207,000.  (PSI, p. 16, lines 400-

402.)  The PSI further notes that the property was lost in foreclosure proceedings in 2009.  (*Id.*)

This information is, however, inaccurate.  Mr. Khan never purchased this condominium; nor was

he a party to any mortgage for that condominium.  Instead, it was one of Mr. Khan's adult

---

[3] As the Court is aware, this designation, or lack thereof, and the relationship between Ilyas Kashmiri and al Qaeda, would have been a major evidentiary issue had this matter proceeded to trial.

[4] Copies of this and other letters submitted on Mr. Khan's behalf have been provided to the Court under separate cover, as well as to the government and Probation Department. For the privacy concerns of Mr. Khan's family members and other individuals who are mentioned herein, references are made to the individuals' initials.

children who purchased this condominium, obtained the mortgage, and unfortunately lost the condominium in foreclosure proceedings.

III.     **POSITION PAPER AND COMMENTARY ON SENTENCNIG FACTORS.**

The sole issue in this sentencing is where, within a small range of five to eight years, this Court should sentence a fifty-eight-year-old medically infirm Defendant, who has already spent sixteen straight months in the MCC's SHU and another ten months in general population thereafter.  Fortunately, no one is in a better position to make that decision than this Court.  In addition to its twenty-five years of experience on the District Court bench, this Court, in many ways, knows far more about this case than defense counsel—particularly in light of the additional CIPA filings and conferences.  As such, it would be presumptuous for counsel to suggest that they could be capable of influencing the outcome in any serious fashion.  For that very reason, counsel will most respectfully, and genuinely, defer to Court's considered judgment that it will do the right thing for Mr. Khan and the government.

However, certain §3553(a) factors that weigh heavily in Mr. Khan's favor are worthy of explication, and follow.

A.     **Mr. Khan's Incarceration in the SHU Has Caused Him Ongoing Severe Physical and Mental Health Issues that Should be Viewed Under §3553(a).**

Mr. Khan's sixteen months of incarceration in the SHU likely has had serious and permanent consequences on his physical and mental health.  These ailments, which are described in the PSI and documented in Mr. Khan's MCC medical records, either did not exist or were greatly exacerbated by Mr. Khan's detention and incarceration in the SHU.  Indeed, the PSI expressly cites Mr. Khan's incarceration in the SHU and the consequent physical and mental health problems as factors that may warrant a sentence outside advisory guideline range under §3553(a).  (PSI, pp. 18-19, lines 473-81.)

While "conditions of presentencing confinement are not considered as part of the §3553(a) factors" (*U.S. v. Turner*, 569 F.3d 637, 642 (7th Cir. 2009)), the Seventh Circuit has, in reliance on Second and Eleventh Circuit authority, observed that "conditions of confinement might warrant a sentencing judge's attention if a defendant can show that the conditions were unusually harsh." *United States v. Ramirez-Gutierrez*, 503 F.3d 643, 645 -646 (7th Cir. 2007) (citing *United States v. Pressley,* 345 F.3d 1205, 1219 (11th Cir. 2003); *United States v. Carty,* 264 F.3d 191, 196 (2d Cir. 2001) (per curiam).) Counsel would submit that in addition to the conditions of his confinement in the SHU—which were indeed unduly harsh and should alone warrant a departure—but also because the physical and mental health problems that Mr. Khan has suffered because of the conditions and duration of his confinement are now part of Mr. Khan's history and characteristics, this falls squarely within the ambit of §3553(a). *See United States v. Miranda*, 505 F.3d 785, 795-96 (7th Cir. 2007); *United States v. Powell*, 576 F.3d 482, 499 (7th Cir. 2009) (district court has authority to consider "physical impairments and advanced age when determining the sentence it believes appropriate under 18 U.S.C. § 3553(a).")

Since his detention and the sixteen months of incarceration in the SHU, Mr. Khan has been diagnosed with rheumatoid arthritis. (PSI, p. 13, line 298.) Prior to his incarceration, Mr. Khan had no symptoms of arthritis, and it was not until his detention in the SHU that Mr. Khan began to suffer pain and swelling in his shoulder, as confirmed by MCC medical records. (PSI, p.13, lines 301-302.) Then, on September 23, 2011, approximately two months after his release from the SHU into general population at the MCC, Mr. Khan was newly diagnosed with onset acute rheumatoid arthritis. (PSI, p. 13, lines 300-301.) As the PSI notes, MCC medical records describe how Mr. Khan now suffers from "swollen and tender joints, joint deformity muscle atrophy, and decreased range of movement in joints throughout [his] body." (PSI, p. 13, lines

304-305.)  Mr. Khan reports that he must now take a pain killer "just to get up from bed in the morning."  (PSI, p. 13, lines 305-306.)  Indeed, Mr. Khan is now prescribed a host of medications to alleviate and address the physical pain from his arthritis, including methotrexate sodium, ALOH/MGOH/SImeth, ibuprofen, and folic acid.  (PSI, p. 13, lines 306-307.)

Mr. Khan's detention in the SHU has also greatly exacerbated his diabetes, with which he was diagnosed shortly before his arrest.  Mr. Khan's wife described that her husband had only been diagnosed as a "borderline diabetic" prior to his arrest.  (PSI, p. 12, lines 290-91.)  However, since his incarceration and lengthy detention, Mr. Khan is now prescribed both insulin and metformin to control his diabetes.  (PSI, p. 12, lines 289-90; p. 19, lines 479-80.)

As noted in the PSI, during and after his detention in the SHU, Mr. Khan suffered severe weight loss of up to 45 pounds.  (PSI, p. 12, lines 284-285; p. 13, line 321.)  Mr. Khan is now diagnosed with high blood pressure and high cholesterol, for which he must take medication to control.  (PSI, p. 13, lines 292-97.)  Mr. Khan also now suffers from dry and itchy eyes and sinus problems—neither of which he had prior to his detention—and for which he is also prescribed medication.  (PSI, p. 13, lines 308 and 313.)  Mr. Khan's son poignantly describes the decline of his father's physical condition when he writes that Mr. Khan's "physical health has deteriorated terribly," and that his father "looks malnourished" and has developed arthritis. (O.K. letter, p. 2.)  Mr. Khan's wife, who visits her husband on an almost weekly basis at the MCC, bluntly observed that Mr. Khan's sixteen months in solitary confinement "destroyed his health."  (PSI, p. 13, line 320.)

Perhaps more serious than these physical health problems, Mr. Khan's incarceration, marked by the sixteen months in the SHU, has caused him serious mental health issues for which he has received neither appropriate treatment nor counseling, despite his ongoing desire to

6

receive counseling. As reported in the PSI, Mr. Khan was truly isolated when he was confined in the SHU, as he could not even read to pass the time due to the fact that he does not read English well. (PSI, p 14, lines 331-32.) As a consequence of his isolation in the SHU, Mr. Khan has now suffered from depression so severe that he reported to Probation that he would have committed suicide had it not been against his religion. (PSI, p. 14, lines 323-33.) Mr. Khan's wife, who has known Mr. Khan for approximately twenty-five years, confirms that her husband began to suffer "severe" depression after his detention in the SHU, and also reported that he told her that he had considered taking his own life. (PSI, p. 14, lines 342-45.)

As acknowledged by the PSI, by the MCC medical records corroborate that Mr. Khan reported mental health problems shortly after his release from the SHU and into general population. Specifically, MCC records dated September 23, 2011, describe a diagnosis of "mood impaired, anxious, sleep impaired, energy-decreased and appetite-decreased." (PSI, p. 14, lines 338-39.) This diagnosis is a stark contrast to the "outgoing, happy, and energetic" person whom his wife described, and who is portrayed in the letters submitted to the Court. (PSI, p. 14, line 343.)

Exacerbating the mental health problems that Mr. Khan began to suffer during his detention in the SHU has been his inability to receive adequate treatment and care. While Mr. Khan has been able to see a psychiatrist in the MCC, he reported to Probation that he was "simply given books to read," which did Mr. Khan little good because of his limited ability to read English. (PSI, p. 14, lines 340.) It should come as no surprise that Mr. Khan has been unable to receive adequate mental health treatment while in BOP custody. According to the Bureau of Justice Statistics, 43.6% of male inmates, and 61.2% of female inmates in federal prison have mental health problems, while only 24.0% of inmates receive any mental health treatment.

*Department of Justice, Bureau of Justice Statistics*, Mental Health Problems of Prisons and Jail

Inmates, 1, 9, *available at* http://bjs.ojp.usdoj.gov/index.cfm?ty=pbdetail&iid=789 (2006) (last

visited May 20, 2012). More disturbing still, and entirely consistent with Mr. Khan's

experiences, is the fact that a mere 15.1% of inmates report receiving "professional mental health

therapy." *Id.* at 9. As the PSI correctly notes, Mr. Khan has survived the ordeal of extended

incarceration in the SHU, and his detention generally, through the support of his family and

loved ones—not due to any treatment that has actually addressed the mental health problems

from which he now suffers. (PSI, p. 14, lines 333-36.) The lack of adequate mental health care

in federal prisons, as Mr. Khan has already experienced, and the fact that Mr. Khan has been

almost entirely dependent on the support of his family to cope with his mental health issues, are

compelling reasons for a sentence at or near the low-end of the five- to eight-year range set forth

in the Plea Agreement.

The physical and mental health problems that Mr. Khan began to suffer after his

incarceration in the SHU are entirely consistent with observations made in the literature

describing the deleterious health consequences of solitary and segregated confinement. Dr.

Stuart Grassian, a leading expert in issues related to solitary confinement and its psychological

impact on inmates, has succinctly observed that solitary confinement "can cause severe

psychiatric harm" to inmates. Stuart Grassian, M.D., *Psychiatric Effects of Solitary*

*Confinement*, 22 WASH. U. J.L. & POL'Y 325, 327 (2006). Dr. Grassian has further noted that the

literature describing the "profound psychiatric effects of solitary confinement," as well as his

own studies, demonstrate that "deprived of a sufficient level of environmental and social

stimulation individuals will soon become incapable of maintaining an adequate state of alertness

and attention to the environment [and] even a few days of solitary confinement will predictably

shift the electroencephalogram (EEG) pattern toward an abnormal pattern characteristic of stupor and delirium."  (*Id*. at 330-31.); *see also* Fred Cohen, *Isolation in Penal Settings: The Isolation-Restraint Paradigm*, 22 WASH. U. J.L. & POL'Y 295, 305 (2006) (observing that studies of the impact of social and sensory deprivation on inmates "describe loss of appetite, sleep disturbances, anxiety, panic, rage, loss of control, hallucinations, self-mutilation, suicide ideation, hopelessness, fecal misuse, and more"); Maria A. Luise, *Solitary Confinement: Legal and Psychological Considerations*, 15 NEW ENG. J. ON CRIM. & CIV. CONFINEMENT 301, 317-320 (discussing solitary confinement studies and stating that "[e]xtended periods of isolation result in mental deterioration and emotional damage.")  Moreover, as Dr. Grassian has described, many individuals subjected to solitary confinement "will likely suffer from permanent harm as a result of such confinement."  (Grassian, *supra*, at 352.)

Courts have also noted that the wealth of literature recognizes that solitary confinement causes serious psychological harm to inmates.  For example, in *Freeman v. Berge*, 283 F. Supp. 2d 1009, 1016 (W.D. Wisc. 2003), the district court held that even though existing law did not clearly establish that sensory deprivation violated the Eighth Amendment for the purposes of a qualified immunity analysis, the "evidence has accumulated regarding the harm that depriving inmates of social interaction and sensory stimulation can cause."  Similarly, in *Madrid v. Gomez*, 889 F. Supp. 1146, 1230 (N.D. Cal. 1995), which involved a class action lawsuit filed on behalf of inmates at the Pelican Bay prison, the district court observed that "[s]ocial science and clinical literature have consistently reported that when human beings are subjected to social isolation and reduced environmental stimulation, they may deteriorate mentally and in some cases develop psychiatric disturbances."

Indeed, the conclusion that solitary confinement has negative psychological affects on inmates should be beyond debate. Judge Posner recognized as much in an opinion reviewing the conditions of the segregation unit at Stateville prison when he observed that it is "pretty obvious … that isolating a human being from other human beings year after year or even month after month can cause substantial psychological damage, even if the isolation is not total." *Davenport v. DeRobertis*, 844 F.2d 1310, 1313 (7th Cir. 1988). Along the same lines, a district court considering a § 1983 challenge brought by an inmate who spent nearly four-and-a-half years in the SHU observed "[a] conclusion … that prolonged isolation from social and environmental stimulation increases the risk of developing mental illness does not strike the Court as rocket science." *McClary v. Kelly*, 4 F. Supp. 2d 195, 208 (W.D.N.Y. 1998).

Due to the severe physical and mental health consequences of solitary confinement, such confinement, in and of itself, is properly viewed as a form of punishment. The Supreme Court recognized as much over 120 years ago in *In re Medley*, 10 S. Ct. 384 (1890). In *Medley*, the Supreme Court considered a petition for habeas corpus filed by an inmate who had been sentenced to death for murder. The inmate challenged the portion of his sentence requiring solitary confinement on the grounds that it was enacted after the commission of the offense, and thus a prohibited *ex post facto* law. The Supreme Court agreed, and concluded that solitary confinement "was an additional punishment of the most important and painful character," and was therefore a forbidden *ex post facto* law. *Medley*, 10 S. Ct. at 171.[5] In a more recent decision, a federal district court reduced the sentence of the notorious Panamanian dictator Manuel Noriega from 40 to 30 years based in large part on Noriega's incarceration in segregated

---

[5] After holding that the inmate's solitary confinement violated the Constitution, the Supreme Court ordered the inmate discharged from custody, notwithstanding the "valid and legal" verdict of guilty for murder, because the invalid *ex post facto* law to which the inmate was sentenced had repealed the former law "under which [the inmate] might otherwise be punished." *Medley*, 10 S. at 174.

confinement, in which he was "largely deprived of the social environment many experts feel is important for mental health." *U.S. v. Noriega*, 40 F. Supp. 2d 1378, 1380 (S.D. Fla. 1999).

Thus, counsel respectfully submit that the sixteen months that Mr. Khan spent confined in the SHU was, in and of itself, punishment inflicted on Mr. Khan and imposed not for any disciplinary reasons or conduct of Mr. Khan. Moreover, this punishment has caused severe and likely lasting consequences to Mr. Khan's physical and mental health. Counsel urge the Court to consider this punishment and its impact on Mr. Khan's health under § 3553(a) as it fashions a sentence within the five- to eight-year range.

**B.      Mr. Khan's Altruistic Character and Strong Family Ties Should be Considered Under §3553(a).**

Also relevant to the Court's §3553(a) analysis of Mr. Khan's history and characteristics are his strong family ties and charitable nature. Mr. Khan's family background is set out in the PSI, and it is not necessary to reiterate that detailed account here beyond highlighting several themes that help portray a more complete picture of Mr. Khan beyond the allegations in the Criminal Complaint and Indictment. (PSI, pp. 9-12.) The themes that course through the PSI, and which nearly jump off the pages of the numerous letters submitted on Mr. Khan's behalf, speak to Mr. Khan's strong family ties and his generosity in helping others who are in need.

As set forth in the PSI and the submitted letters, Mr. Khan has a large family that is spread across three continents. Despite the diasporic nature of his family Mr. Khan has been able to maintain contact with his family members, even during his incarceration. In addition to his three adult children, two in Chicago and one in England, Mr. Khan has two young children in Pakistan, including a two-year old son whom he has not yet met due to his arrest and incarceration. (PSI, p. 11, lines 230-35; N.K. letter.) Prior to his detention, Mr. Khan helped financially support his wife in Pakistan. Since his detention, Mr. Khan has continued to maintain

contact with his wife in Pakistan, and other family members have helped provide financial support now that Mr. Khan has been incarcerated and unable to provide that support to his family in Pakistan. (PSI, p. 11, lines 234-25, 238-40.)

Illustrative of Mr. Khan's dedication to keeping his family together is how he alone cared for his daughter in Pakistan after his then wife returned to the United States and how, upon his own return to the United States, Mr. Khan sought out and found his son in California, literally showing up at his son's middle school to reconnect with him and establish a relationship that remains to this day. (*See* F.K. letter; R.K. letter p. 2 (describing how Mr. Khan was both "father and mother"; and O.K. letter.)

Also telling is the type of care that Mr. Khan provided for his family, and the enriching experiences that he provided to his children through travel and exposure to other cultures. As his daughter and son state in their letters, Mr. Khan ensured that they received the best education possible while they were in Pakistan. Mr. Khan's daughter also describes how her father not only provided her with an English education in Pakistan, but also taught her how to drive and gave her opportunities that were not otherwise available for girls in Pakistan. (PSI, p. 10, lines 212-15; F.K. letter, p. 1.) Mr. Khan's care for his children reaches to his grandchildren, including F.K.'s disabled son, and also extended family members who view him as a father or grandfather. (PSI, p. 11, lines 219-21; F.K. letter, p. 2; N.F. letter, p. 2 (describing how Mr. Khan interacted with his grandchildren and his positive impact on their lives); S.A. letter (grand-niece who describes how she views Mr. Khan as her grandfather)). Mr. Khan has also considered D.S.'s children and grandchildren as if they were his own, and has shared with them his love for travel and family. (*See* S.B. letter.)

The PSI and submitted letters also show that Mr. Khan is an altruistic individual who is compelled to help others, especially those in need. Mr. Khan's daughter describes how, in Pakistan, Mr. Khan would help everyone whom he could help and that he was "always generous." (PSI, p. 10, lines 215-17.) Numerous letters provided to the Court from Pakistan corroborate this fact. (*See* A.B. letter; M.I. letter; M.K. letter.) Mr. Khan's son succinctly summarized his father's character when he wrote: "[w]hen someone is in need, he will help them without them asking." (O.K. letter.) Mr. Khan's nephew writes that he grew up "seeing [Mr. Khan] help the poor people and give to the need." (M.A. letter.) Similarly, Mr. Khan's older brother writes that Mr. Khan is "very generous in giving out to the poor." (A.D. letter.) Mr. Khan's son describes how his father "has a big heart, a heart that extends to anyone who has a problem or anyone who needs help weather [sic] it be a close relative or stranger. He can not say no to anyone even if it's [sic] beyond his means." (R.K. letter, p. 1.) And in explaining her father's generosity, Mr. Khan's daughter writes: "[i]f someone was sick and unable to afford medicines, he would help. If someone was hungry he would make sure that person was fed … Anyone who came to our door asking for help, knew that my father would always be there no matter what."

In addition to the letters from individuals in Pakistan describing how Mr. Khan helped better their lives, whether it be through helping to buy a refrigerator or helping someone with a broken leg, other specific examples of Mr. Khan's charity include his donations of twenty sewing machines to a sewing school run by the Sadai Haq Society in Islamgarh, Pakistan, for the benefit of impoverished women and girls. (*See* Sadai Haq Society letter; D.S. letter, pp. 1-2.) Defendant was also a regular donor to the Islamgarh Welfare Trust, an NGO that provides services, including health care, to poor people in and around Islamgarh. (*See* Islamgarh Welfare

Trust letter.)  Mr. Khan's wife described how her husband and his older brother donated funds to help Mr. Khan's neighbor in Pakistan expand his house to include additional rooms and an indoor bathroom and kitchen when the neighbor was in need.  (D.S. letter, p. 1.)  Mr. Khan's older brother recalls one instance when Mr. Khan "bought a hand sewing machine for one widow to [sic] that she can feed her family by sewing clothes and earning a living from it."  (A.D. letter.)

In addition to his international charity, Mr. Khan has been active in assisting individuals in the taxi cab driver community in Chicago.  (*See* D.S. letter, p. 2 (stating that Mr. Khan worked for three advocacy groups for cab drivers); R.K. letter, p. 1 (noting that Mr. Khan volunteered for cab organizations to help improve driver safety and to advocate for increased wages); B.B. letter, p. 1; N.R. letter.)

To fully appreciate Mr. Khan's altruism and charity, one must return to his roots.  Mr. Khan grew up with very little in terms of money and amenities.  Now a naturalized U.S. citizen for over twenty years, Mr. Khan was born in Pakistan to a farming family.  His father died when he was nine and, to help support the family, Mr. Khan began to work as a farm laborer after his father's death.  (PSI, p. 9, lines 161-63.)  Mr. Khan has been working since then, mainly as a cab driver.  Yet, despite his modest means, Mr. Khan has always been able to provide his family members, particularly his children, both with the essentials and also with unique international travel experiences and good educations that have helped them achieve success. Mr. Khan has also given generously to those in need, whether it is giving the money in his pocket to a fellow cab driver or whether it is donating 20 sewing machines for impoverished women in Pakistan.

Counsel submit that Mr. Khan's strong family ties and altruistic nature should also be considered under § 3553(a), and should weigh in favor of a sentence at or near the low-end of the five- to eight-year range of imprisonment.

## IV.    RESPONSE TO GOVERNMENT'S SENTENCING MEMORANDUM.

Counsel were prepared to file Mr. Khan's sentencing papers without any reference to the facts of the case in light of the Plea Agreement, the facts admitted in the Plea Agreement, and the Court's prior acceptance of the Plea Agreement—the latter being based upon counsel's knowledge of the Court's thorough understanding of this entire investigation.  However, the Government's Sentencing Memorandum filed on June 1, 2012, requires at least some comment in light of its aggressiveness. (Dkt. No. 65.)  First, and foremost, the Court should be aware that it was the government that approached defense counsel about this Plea Agreement, not the other way around.  Had the government wanted an agreed Rule 11(c)(1)(C) sentence of eight years, as it urges, it could have insisted upon such a sentence, which it knows full well would have resulted in the trial it chose to avoid—for whatever reasons counsel do not now wish to hypothesize or belabor at this stage of the proceedings.

Second, in that Mr. Khan continues to accept responsibility for his conduct and does not wish to take any position to the contrary, counsel are nonetheless compelled to point out to the Court that this very favorable plea agreement did not evolve out of thin air.  The government knows full well that Mr. Khan would have gone to trial to contest a number of issues that in the spirit of the Plea Agreement and Mr. Khan's continued acceptance of responsibility need not be debated at this stage of the proceeding.  As in all stories there are two sides, and had this case gone to trial, suffice it to say for now that a different story could well have been told from much the same evidence the government has elicited in its memorandum.  This should be quite evident

to the Court based simply upon a comparison of the facts which Mr. Khan admitted in the plea agreement to those set forth in the government's sentencing memorandum. Again, in that Mr. Khan wishes to abide by the terms of the Plea Agreement, counsel do not wish to belabor these differences any further other than to make the rather self-evident observation that in a charge as nebulous as material support to terrorism, even in a guilty plea sufficient to provide a factual basis, there is room for reasonable minds to disagree as to all apocalyptic inferences from the conduct in question.[6]

Finally, by not demanding an agreed eight-year sentence, or higher for that matter, the government's Plea Agreement expressly and implicitly acquiesces to the possibility that a five-year sentence is appropriate. For all of the reasons set forth herein, counsel again defer to this Court's sound judgment, but respectfully suggest that a sentence at the low-end of the agreed range is more appropriate under all the circumstances.

---

[6] See for example, *Holder v. Humanitarian Law Project*, 130 S. Ct. 2705, 2708 (U.S. 2010), and the controversy the Supreme Court's ruling has created regarding the scope of that decision. *See, e.g.*, David Cole, *Chewing Gum for Terrorists*, N.Y. TIMES, Jan. 2, 2011 (*available at* http://www.nytimes.com/2011/01/03/opinion/03cole.html?_r=4) (last visited Jun. 5, 2012) (rhetorically questioning whether former Attorney General Michael Mukasey, former New York Mayor Rudolph Giuliani, and Tom Ridge "all commit[ted] a federal crime" when they spoke in support of the Mujahadeen Khalq under the broad holding of *Humanitarian Law Project*); Noah Bialostozky, *Material Support of Peace? The On-the-Ground Consequences of U.S. and International Material Support of Terrorism Laws and the Need for Greater Legal Precision*, 36 THE YALE JOURNAL OF INTERNATIONAL LAW ONLINE 59, 60 (available at http://www.yjil.org/docs/pub/o-36-bialostozky-material-support-of-peace.pdf) (last visited Jun. 5, 2012) ("the *HLP* decision has left many international actors uncertain as to whether their routine humanitarian, development, or peacemaking activities, particularly in conflict situations"). Again, counsel only point this out for rhetorical purposes, and in no way wish to minimize Mr. Khan's admitted conduct.

Respectfully submitted,


/s/ Thomas Anthony Durkin
**THOMAS ANTHONY DURKIN,**


/s/ Janis D. Roberts
**JANIS D. ROBERTS,**


/s/ Joshua G. Herman
**JOSHUA G. HERMAN.**


**DURKIN & ROBERTS**
2446 North Clark Street
Chicago, IL 60614
(312) 913-9300

**CERTIFICATE OF SERVICE**

Joshua G. Herman, Attorney at Law, hereby certifies that the foregoing Defendant's Objections to the Presentence Investigation Report, Position Paper and Commentary on Sentencing Factors, and Response to the Government's Sentencing Memorandum was served on June 5, 2012, in accordance with Fed.R.Crim.P. 49, Fed.R.Civ.P.5., LR 5.5, and the General Order on Electronic Case Filing (ECF) pursuant to the district court's system as to ECF filers.

/s/ Joshua G. Herman
**JOSHUA G. HERMAN**
2446 North Clark Street
Chicago, Illinois 60614
(312) 913-9300